**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

UNITED STATES OF AMERICA

v.                              No. 4:12CR00041 JLH

BOB SAM CASTLEMAN;
REBECCA LUCILLE SPRAY

**OPINION AND ORDER**

Bob Sam Castleman and Rebecca Spray are charged with conspiring to manufacture methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), 846, and conspiring to possess equipment, chemical products, and materials that they know, intend, and have reasonable cause to believe would be used to manufacture methamphetamine, in violation of 21 U.S.C. §§ 843(a)(6), 843(d), 846. Castleman also is charged with making his home available for the use, manufacture, storage, and distribution of methamphetamine, in violation of 21 U.S.C. §§ 846, 856(a)(2). Castleman and Spray have moved to suppress evidence obtained from a search of Castleman's pickup truck conducted in the city of Walnut Ridge, Arkansas, by a police officer from the city of Hoxie, Arkansas. The Court held an evidentiary hearing on the motions. For the following reasons, the motions to suppress are denied.

**I.**

Hoxie and Walnut Ridge are contiguous cities, with Walnut Ridge lying immediately northeast of Hoxie. A Farm Service, Inc. store is located in Walnut Ridge, a few hundred feet from Hoxie. Among the products sold by the Farm Service store are items that can be used to make methamphetamine, such as Liquid Fire drain cleaner, Coleman fuel, vinyl tubing, and starting fluid. Tracy Moore, a seventeen-year employee of the store, has learned what products can be used to produce methamphetamine and on numerous occasions has informed the police when customers

purchased products apparently for the purpose of producing methamphetamine. Moore's tips have resulted in several arrests, including one in which the suspects were found operating a methamphetamine lab in their vehicle immediately after leaving the Farm Service store.

On April 11, 2011, Moore observed a man buy Coleman fuel, walk out of the Farm Service store, and get into a pickup truck. Then Moore observed a woman get out of the same truck, walk into the Farm Service store, and buy vinyl tubing. At this point, Moore called Glen Smith, Chief of Police of the Hoxie Police Department, to alert Smith that these persons had purchased items used to manufacture methamphetamine and had done so in a suspicious manner. Moore told Smith what the suspects had purchased, and he described them and the pickup truck they were driving. Moore called Smith instead of the Walnut Ridge Police Department because Smith responds to his calls more quickly.

After receiving Moore's call, Smith drove to the Farm Service store. As he approached, he saw the pickup truck pull out of the store's parking lot and head northbound on Highway 67 through Walnut Ridge. Smith followed the truck for about a half of a mile or a mile and witnessed the truck commit a traffic violation by crossing over the highway's center turn lane and back into the driving lane, without signaling. Smith notified Detective David Burnside of the Walnut Ridge Police Department that he was making a traffic stop, and he pulled the truck over. Burnside arrived almost immediately. Smith approached the driver's side of the pickup truck and, as he did so, noticed tubing in plain view near the console area between the front seats of the car. Bob Sam Castleman was driving the truck, and Rebecca Spray was a passenger. Both of them gave Smith their drivers' licenses to run, i.e., to determine if the licenses were valid and if they had any outstanding warrants or were on probation.

2

When he ran Spray's license, Smith found that she was on probation. He then called Spray's probation officer, Stephanie Willbanks, who told him that Spray was under supervision and subject to search by any law enforcement officer. Smith then approached the passenger side of the vehicle to speak with Spray and, as he did so, observed a box of pills in the front floorboard of the passenger's side of the car. Smith asked Spray to get out of the vehicle and, then, according to Smith, he gave Spray her *Miranda* warnings. Smith informed Spray of the call that he had received from the Farm Service store regarding purchases of supplies used to produce methamphetamine, and Spray told Smith that she and Castleman were buying "stuff," including fuel and pills, to take to Castleman's house for a third person.

Smith then searched the vehicle, finding four boxes of pseudoephedrine pills, one can of Coleman fuel, clear plastic bags, and vinyl tubing. *See* Document #134, at 24. Smith took Spray to the Hoxie Police Department, while Burnside waited with Castleman until Castleman's truck was towed and then brought Castleman to the Hoxie Police Department.

## II.

The Fourth Amendment states, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. The amendment does not explain how people's right to be free from unreasonable searches and seizures should be enforced. As one means of enforcing this right, the Supreme Court created the exclusionary rule, which bars the prosecution from introducing evidence obtained through a Fourth Amendment violation. *See Davis v. United States*, 131 S. Ct. 2419, 2423, 180 L. Ed. 2d 285 (2011). Castleman and Spray argue that the government's evidence from Castleman's vehicle was obtained through a violation of the Fourth Amendment's prohibition against unreasonable

3

searches and seizures and that the exclusionary rule should therefore apply. Spray also argues that she was not given the *Miranda* warnings before making a statement to Smith.

Castleman and Spray first contend that the evidence must be suppressed because Smith did not have authority as a police officer to initiate a traffic stop in Walnut Ridge. *See Perry v. State*, 303 Ark. 100, 101, 794 S.W.2d 141, 142 ("A local peace officer acting without a warrant outside the territorial limits of the jurisdiction under which he holds office is without official power to apprehend an offender, unless he is authorized to do so by state statute."). The government does not contend that Smith had authority in his official capacity as a Hoxie police officer to initiate a traffic stop in Walnut Ridge. Rather, the government contends that the Fourth Amendment was not violated even though Smith acted outside of his jurisdiction.

In *Virginia v. Moore*, the Supreme Court held that an arrest that violates state law does not necessarily violate the Fourth Amendment. 553 U.S. 164, 177-78, 128 S. Ct. 1598, 1607-08, 170 L. Ed. 2d (2008) ("We conclude that warrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution, and that while States are free to regulate such arrests however they desire, state restrictions do not alter the Fourth Amendment's protections."). The sole issue under the Fourth Amendment is whether the officer had probable cause to believe that a person committed a crime in the officer's presence. *Id.* at 178. "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810, 116 S. Ct. 1769, 1772, 135 L. Ed. 2d 89 (1996); *see United States v. Peralez*, 526 F.3d 1115, 1119 (8th Cir. 2008) ("An officer who observes a violation of the law has probable cause to initiate a traffic stop, and such a stop comports with the Fourth Amendment.").

4

The Eighth Circuit has applied the Supreme Court's holding in *Moore* to instances in which an officer makes an arrest outside of his jurisdiction. *See Rose v. City of Mulberry, Ark.*, 533 F.3d 678, 679 (8th Cir. 2008). In *Rose*, a Mulberry, Arkansas, police officer arrested Rose for a traffic violation on Interstate 40, even though the officer did not have jurisdiction to patrol Interstate 40 under Arkansas law. *Id.* The court held that even though the officer lacked authority under Arkansas law to make traffic stops and arrests on Interstate 40, no Fourth Amendment violation occurred because the officer had probable cause to believe that Rose committed a traffic violation. *Id.* at 680; *see also Marksmeier v. Davie*, 622 F.3d 896, 901 (8th Cir. 2010) ("[I]t is unnecessary to decide whether Officer Davie was acting within his primary jurisdiction at the time he arrested Marksmeier because even if the arrest violated Nebraska law, it did not violate the Fourth Amendment."); *White v. Spencer*, No. 07-CV-1012, 2008 WL 2945575, at *3 (W.D. Ark. July 28, 2008) ("The mere fact that [the officer] may have been acting outside his territorial jurisdiction does not equate to a violation of the Fourth Amendment on his part.").

Smith witnessed Castleman commit a traffic violation by crossing in and out of Highway 67's center turn lane without signaling. Because Smith witnessed Castleman commit a traffic violation, he had probable cause to make a traffic stop. Hence, the traffic stop did not violate the Fourth Amendment.

Castleman and Spray also argue that the investigative detention after the traffic stop constituted an unreasonable seizure, that the search of Castleman's vehicle constituted an unreasonable search, and that Smith lacked probable cause to arrest them.

A police officer "may conduct an investigation that is reasonably related in scope to the circumstances that initially justified the stop." *United States v. Bracamontes*, 614 F.3d 813, 816 (8th

5

Cir. 2010). Such an investigation includes numerous routine but somewhat time-consuming tasks, such as (1) inquiring into the occupants' destination, route, and purpose, (2) running background checks on the vehicle's registration and the occupants' criminal history, and (3) asking for consent to search the vehicle. *See United States v. Buenrostro*, 454 Fed. App'x 523, 525 (8th Cir. 2011) (unpublished opinion); *Bracamontes*, 614 F.3d at 816. An officer can expand the scope of the traffic stop and can continue to detain a vehicle's occupants after the initial stop is completed if the officer is "aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *United States v. Shafer*, 608 F.3d 1056, 1062 (8th Cir. 2010) (internal quotation marks omitted) (citing *Terry v. Ohio*, 392 U.S. 1, 20-21, 88 S. Ct. 1868, 1879-80, 20 L. Ed. 2d 889 (1968)). "'Whether an officer has reasonable suspicion to expand the scope of a traffic stop is determined by looking at the totality of the circumstances, in light of the officer's experience.'" *Bracamontes*, 614 F.3d at 816 (quoting *Shafer*, 608 F.3d at 1062). Further, the Fourth Amendment's reasonableness determination does not involve inquiries into officers' motivations for initiating a traffic stop, even if that stop is a "mere pretext for a narcotics search." *Whren v. United States*, 517 U.S. 806, 812-14, 116 S. Ct. 1769, 1774, 135 L. Ed. 2d 89 (1996) (quoting *United States v. Robinson*, 414 U.S. 218, 221, 94 S. Ct. 467, 470, 38 L. Ed. 2d 427 (1973)).

The Fourth Amendment generally requires that police officers secure a warrant to conduct a search. *See United States v. Blaylock*, 535 F.3d 922, 926 (8th Cir. 2008) (citing *Maryland v. Dyson*, 527 U.S. 465, 466, 119 S. Ct. 2013, 2014, 144 L. Ed. 2d 442 (1999)). A few specific exceptions to this requirement exist, however, including the "automobile exception." *See Dyson*, 527 U.S. at 466, 119 S. Ct. at 2014. Under the automobile exception, if police officers have probable

6

cause to believe that contraband exists in a vehicle, the officers may conduct a search of the vehicle "that is as thorough as a magistrate could authorize in a warrant 'particularly describing the place to be searched.'" *United States v. Ross*, 456 U.S. 798, 800, 102 S. Ct. 2157, 2160, 72 L. Ed. 2d 572 (1982). The automobile exception has no separate exigency requirement. *Dyson*, 527 U.S. at 466, 119 S. Ct. at 2014. "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir. 2000). In *Fladten*, for example, probable cause existed when an officer saw a reflux condenser glass tube – an item the officer knew often was used in the manufacture of methamphetamine – in plain view in the back seat of a vehicle parked in a driveway of a house where agents had found evidence of drug-related activity. *Id.* at 1085-86. The automobile exception allowed the agents to search without a warrant anywhere in the car, including the trunk, where methamphetamine or materials used to produce methamphetamine might be located. *Id.* at 1086.

Probable cause for an arrest exists when the facts and circumstances within the officers' knowledge and of which they have trustworthy information are sufficient to warrant a man of reasonable caution in believing that a crime has been or is being committed. *Brinegar v. United States*, 338 U.S. 160, 175-76, 69 S. Ct. 1302, 1310-11, 93 L. Ed. 1879 (1949).

As explained above, Smith received a call from Moore describing suspicious activity – two persons from one vehicle went one-at-a-time into the store to buy two products commonly used to produce methamphetamine. The mere fact that two persons buy Coleman fuel and vinyl tubing might not give rise to a reasonable suspicion; but, ordinarily, two persons riding together would enter the store and make their purchases together, or one person would purchase both items at the same time.

7

Castleman and Spray, however, acted in a manner designed to conceal the fact that they were together and were acting in concert to purchase two products that could be used to produce methamphetamine. After he made the stop, Smith observed one of those products, vinyl tubing, in plain view in the front console area of Castleman's truck when he approached the truck to ask for identification. He also learned that Spray was on probation and he spoke with her probation officer. He saw pseudoephedrine pills in the passenger side floorboard when he went to talk to Spray. After he gave Spray her *Miranda* warnings, Spray informed him that she and Castleman were buying "stuff," including fuel and pills, to take back to Castleman's house for another person.

In summary, Smith knew of particularized facts that gave rise to a reasonable suspicion that Castleman and Spray were conspiring to produce methamphetamine, so after the traffic stop he could legitimately expand the scope of the stop to investigate further; when he conducted the search, he had facts from which a reasonable person could believe that there was a fair probability that evidence of a crime would be found in the truck; and when he arrested Spray he had knowledge of facts that would warrant a man of reasonable caution in believing that Castleman and Spray were participating in a conspiracy to produce methamphetamine. The facts were sufficient to support extending the stop, the subsequent search, and the arrests.

Finally, Spray argues that Smith did not give her *Miranda* warnings after he asked her to step out of the vehicle due to his conversation with Spray's parole officer. Smith, however, testified that he did give her *Miranda* warnings after she stepped out of the vehicle. No evidence to the contrary has been presented. *See* Document #134, at 23, 39-40. Smith was a credible witness, and his testimony on this point stands uncontested. Therefore, the Court finds that Smith gave Spray her

*Miranda* warnings after he asked her to step outside the vehicle and before she made the statements at issue.

## CONCLUSION

Because the evidence obtained against Castleman and Spray was not a result of a Fourth Amendment violation and because Spray was given proper *Miranda* warnings, Castleman's and Spray's motions to suppress are DENIED. Documents #75 and #110.

IT IS SO ORDERED this 17th day of October, 2012.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE